Good morning, your honors. My name is Michael Wolfe. I'm the attorney for the plaintiff's appellant in this case. And may it please the court, the district court correctly found that the defendants breached their fiduciary duties by using retail class shares of three mutual funds instead of institutional class shares, which were the exact same investment in the exact same mutual fund, but a much reduced cost to the participants. However, the district court did not apply that logic to three other mutual funds that were at issue at trial, which also the defendant selected the retail share class instead of the institutional share class, merely because those funds were first put into the plan over six years before the complaint was filed. That was an incorrect application of ERISA's six-year limitation period, which does not start the six-year time period until the date of the last action constituting a part of a breach or the date when the fiduciary could have fixed a breach by omission. That application of the statute of limitations also violated the continuing nature of a fiduciary's duty to review plan investments and remove imprudent plan investments. Now, your claim is that Edison included the challenged investment options in the plan menu. That was the decision that you're challenging, are you or not? No, Your Honor. The decision we're challenging is keeping these investments in the plan. So there's not only a breach in terms of selecting retail mutual funds without considering the alternatives, but it's also a breach to retain those funds in the plan without – There was a violation theory which I thought we criticized in Phillips. You did criticize the continuing violation theory in Phillips as to the actual knowledge through year limitation, and that limitation period starts on the first day when the plaintiff has actual knowledge of the breach. So it's a different concept of the statute. The six-year limitation statute incorporates this continuing violation aspect of things by starting the limitation period from the date of the last action constituting part of the breach or the date on which the fiduciary could have fixed a breach by omission, such as that here, their failure altogether to consider the institutional share class alternatives for the other mutual funds in this plan. So we have to look at 413.1a and 1b to decide whether it's the initial inclusion in the plan that's determinative or the, as you suggest, failure at any given time to get rid of them. Well, you'd still have the same claim, would you not? Well, Your Honor, I mean, to an extent it becomes a degree of semantics in terms of what you're deeming to be the breach. But the fiduciary duty here is removing imprudent funds from the plan. You can't have an imprudent investment option. So if you just happen to have one come into the plan and never undertook a fiduciary process to determine whether that's actually prudent, you have to undertake that process at some point in time. And if you don't, the plaintiffs, the participants, have the right to recover losses to the plan caused within the past six years after they commence their action. And that's inherent in the nature of the statute itself, which looks at the date of the last action constituting a part of the breach. And that's a different kind of statute from the actual knowledge statute at issue in Phillips, which starts on the first date where the participant has actual knowledge of the breach. Because if you allowed continuing violation to constantly be a new source for the claim, you would be reading out that actual knowledge limitation and the point of starting the statute from the first date on which you have actual knowledge. That's the opposite of what we have with the six-year limitation period. Also, applying the statute in that way also leads to a contradictory result. The district court said it is a breach of ERISA's fiduciary duties, the highest duties under the law, to have retail mutual fund shares in a plan when institutional shares are available. But at the date the judge made that determination, the plan still had a retail share class mutual fund, which the court said is imprudent, improper to have. Yet the fiduciaries were free. Didn't the court say that it wasn't having the two or having the retail in it, it was the decision not to evaluate the choice between the retail and the institutional? Well, but that wasn't a choice. They didn't choose to not do that. They just didn't do it. It was a matter of neglect. They failed to perform their duty of looking at the Bible. What is your assertion as to their failure in duty? Failing to consider, failing to look at the institutional class shares and come to a reasoned decision as to why retail class shares are better for this plan under these circumstances. And they do have a continuing duty to do that throughout the time that they're administering this plan. That's inherent in the continuing nature of the fiduciary's duty. So you have to kind of- What is a continuing violation duty? When does it end? When does the statute run? Doesn't it eviscerate the statute? It does not, Your Honor. I mean, in a sense, it's a rolling six-year statute. But so long as the fiduciaries are on a regular basis looking at their decision, we're going to continue with retail shares. There hasn't been any change in the analysis and the factors we consider for why that's proper, so we're going to still continue to do that. Now, yes, in a sense, new participants come to the plan. They may look at that and they may challenge that, but the fiduciary is going to have a ready defense. Here's our prudent process. We've reexamined it every year. We found that to still be valid under the current factors, they are not going to be liable for their decision. In fact, the claim may fail just on the pleadings itself. So there is some protection there. But this is not a plain statute of limitation where it's just the act and six years later and it's over. Congress is specifically put in. It's rolling. It is the date of the last action that's part of the breach or the failure to cure a breach by omission, and that indicates Congress' intent that the fiduciaries continue to perform their duties  Now, the other contradictory result of the district court's application of the six-year limitation period is that if a fiduciary neglects to perform his duties at some point in time, he has an incentive under the district court's application to do nothing for six years, because after six years passes, now he's free from ever having to perform that duty, right? He didn't perform his duty six years ago. As of year six plus one, now he never has to perform that duty, because under the district court's interpretation, the statute has run and no one can sue. And that is contrary to the nature of arrestless fiduciary duties of protecting the participants. Now, the failure, the district court correctly applied the analysis of you have to consider the alternatives and have a reasoned decision for why you're choosing one versus another alternative to show that you've had a prudent process here. The district court also did not apply that analysis. In addition to not applying that analysis to funds that were over six years old, the district court did not apply that analysis to the stable value fund claim and the company stock fund claim, because in the stable value fund claim, the fiduciaries never considered a stable value fund, a type of investment designed for retirement plans to provide income and safety of principle for the plan option that was designed to maximize current income while preserving capital and liquidity. Even defendant's own experts admitted that most plans use stable value funds  Don't we have to allow a certain amount of reasonable discretion? I won't say that it's total discretion, but some room for reasonable and prudent business judgment in the selection of these options. We can't second guess every single decision, can we? You're absolutely right, Your Honor. You can't second guess every single decision, but the business judgment rule does not apply to ERISA, and that's specifically been so held. The degree of deference or allowance for the fiduciary's decision making is in the prudent process requirement. So long as the fiduciary has had a prudent process actually considering the alternatives and coming to a reasoned decision as to why its choice is the prudent choice for the participants. Well, with respect to the money market fund, aren't there record findings that has considered the money markets as against the stable value funds and track the benchmarks? There is no record evidence that the fiduciary's ever considered an actual stable value fund for this option. The district court erroneously construed the record in that way, and if you look at ER, that's a record 1572 to 1575, which is the portion that the judge relies on for that. David Ortel says, just makes general things of, oh, we considered options and we had a short-term bond fund, and that was good enough. There was never consideration of the actual stable value fund option and why the one they chose was proper. And keep in mind, what they chose was not a money market mutual fund. I mean, there could be an argument for a particular plan that the benefits of SEC oversight for a money market fund makes it a better option for our plan than a stable value fund. That may well be a prudent process. Here, they didn't use a money market fund. They used what's called a short-term investment fund, or STIF, which is a short-term cash sweep account that banks use that's not governed by the SEC. So they didn't even get SEC regulation as part of the bargain, if that were even a consideration they had in choosing that option instead of a stable value fund, for which there's no record. They never went through that decision-making process. In addition, Hewitt Financial Services, the record keeper of this plan, said, you should use stable value fund, better returns for the same preservation of principle. Twice they said it. They never – the committee never considered that option, never made a decision on, okay, that is an option, but we're not going to use it because. That same problem arises with a company stock fund because – You have nine minutes left. The Department of Labor has, like, six minutes of that, and you also have, if you wish, rebuttal, but your total time for your side is 20 minutes, so keep that in mind. Thank you, Your Honor. And I'll wrap up shortly here to allow the Department of Labor. The Department of Labor may consume the rest of the time of your side. I just want to point you to that. Thank you, Your Honor. I appreciate that. The same problem arises with the company stock fund because they never considered a direct investment in Edison stock, which is a large capitalization stock trade of the New York Stock Exchange, could easily have handled any transactions in this plan for purchases and sales of that stock. And participants could have looked up the value of their Edison stock investment day-to-day through the Internet if that was a valid reason for having that in there. Another point I'd like to point out, the district court erroneously interpreted the plan, which said the cost of administration of the plan would be paid by the company to mean something other than it plainly means on its terms. Edison was supposed to pay the cost of administration of the plan. It put retail mutual funds in the plan because it provided revenue sharing to Hewitt, which Hewitt then used to reduce Edison's cost of administering the plan. That was a prohibited transaction under 406b-3, as we argue in our brief. And I would also like to add that on the attorney fees side of this appeal, the district court originally decided in applying the Hummel factors that plaintiffs were entitled to an attorney fee, but changed its mind for improper reasons, including payment of electronic discovery expenses as copy costs, which race tires, the Third Circuit case, said was improper, for the same reasons that the Supreme Court recently in Panaguchi said is improper. And I'll reserve the balance of my time for rebuttal. Thank you. Thank you, counsel. Good morning. You may please the court. Elizabeth Hopkins on behalf of the Secretary of Labor is amicus curiae in this case. First, I want to start out with the statute of limitations and point out that under the six-year statute of limitations in 29 U.S.C. 1113, unlike the three-year period, which runs from the earliest date on which a plaintiff has actual knowledge of the breach, the six-year period runs from the state of the last action, which constituted a part of the breach or violation, or in the case of omission, recognizing that there can be breaches of omission, the latest date on which the fiduciary could have cured the breach or violation. Here the plaintiffs are alleging that the fiduciaries breached their duties of prudence by continuing to allow investments that had improper and excessive fees all during the six-year period and by failing during that six-year period to substitute more prudent investments with more reasonable fees, as well as that the fiduciaries repeatedly permitted illegal payments of consideration to a planned fiduciary in violation of ERISA's prohibited transaction rules. Again, really in order to address the issue, isn't this the same breach that they could have brought prior to the six-year period? The answer to that is really no. These are breaches of prudence. And in order to determine the prudence of an action or an omission, you look at the facts and circumstances that pertain at the time. Facts like, you know, the process that the fiduciaries used or didn't use during that six-year period to determine whether the fees were proper for the plan, whether there were available alternative investments, again, during that six-year period, not at some earlier period that's really irrelevant. The services being given in exchange for the fees, who authorized the fee transactions, et cetera. All those kinds of issues have to be looked at at the pertinent time. So, in fact, you know, the breach or the claim is not exactly the same. So what's relevant about the initial decision to invest then? Really nothing is relevant. No, I mean it's a historical, interesting. The fact that it was fully discussed and disclosed numerous times, not just at the initial point, but later on, to ignore that? Well, it really, I mean, it's an interesting historical fact. It may show a pattern of breaches, but it really isn't relevant to whether the fiduciaries are currently breaching their fiduciary duties or whether they breached them during the six-year period. The statute of limitations, the six-year period, you know, does run in the sense that any losses pertaining to that period, pertaining to the period prior to that six years before filing suit, losses resulting from fiduciary breaches, if there were some during that period, would not be recoverable. That's what the six-year limitation period cuts off. But it doesn't cut off losses for the fiduciary's actions or failure to act during the six-year period. Really, that is very different from the three-year statute of limitations period at issue in Phillips. And, in fact, if one were to apply the rule that the defendants are proposing here, it would mean that it would lead to several irrational results, I think. And one of the most irrational ones, it would mean that even if the participants were not, even if the plaintiffs were not even participants in the plan at the time the investments were initially solicited, so long as six years have passed since that initial selection under defendant's theory, the plan can pay excessive and illegal fees forever, unless, or at least until there's some kind of unspecified change of circumstances. And, in fact, the defendants acknowledge that they're asking for this kind of rule, and they say, well, that's, you know, that's what ERISA and its statute of proposed require. But, in fact, neither the terms of 1113, which, you know, speak of the last act or the latest date in which there's an omission, or ERISA's duties of prudence, which require fiduciaries to act at all times as prudent and loyal fiduciaries with regard to the management of the plan and its assets, both of those indicate that there is no repose of this kind for fiduciaries, that they do owe an obligation at all times to act prudently. I'd like to, if I can, try to briefly address the 404C issue. It really sort of involves a similar attempt, I'd say, by the plan's fiduciaries to really absolve themselves of any obligation to act prudently or loyally or otherwise in accordance with ERISA in safeguarding the assets of the plan, so long as, according to the defendants, this is a defined contribution plan that was designed under Section 404C of the statute to allow participants control over investment allocations in their individual accounts. But defendants are wrong to say that this fact somehow absolves them of all responsibility and liability for prudently selecting the plan investments and for ensuring that the plan actors refrain from engaging in prohibited transactions. This is not required by the text of 404C. It provides that in the case of this kind of defined benefit plan that allows participants to exercise control over their individual accounts, that if the participant- It's not necessarily categorization of investments. It's did the committee make the proper investigation. Does the prudence? It involves whether they investigated it, but also objectively, you know, whether it was imprudent. And so, for instance, the district court in this case held, with regard to three of the mutual fund investments, that not only did they not look at whether they could have gotten the same thing for less, that, in fact, they could have gotten exactly the same thing, exactly the same kind of investment, not exactly the same kind, exactly the same investment for, you know, institutional rates. Are you talking about a unitized fund, among other things? No, this is about whether they- The money market? No, this is about the mutual funds for which they paid retail-level fees rather than institutional-level fees. And there were two share classes, one of which could have been had by this- could have been obtained by the plan fiduciaries here. And the only difference between the retail mutual fund and the institutional mutual funds in those three instances was that one was more expensive. And, you know, the district court not surprisingly found that it was imprudent to select something where you could have gotten the same thing for the plan for less. There were a number of other funds, many, many other funds where this claim was being made. Thank you, counsel. The time for your side has expired. Thank you very much. We will hear from the other side. Good morning, your honors. May it please the court. John Hacker for the Edison entities in this case. The district court carefully evaluated the legal and factual issues presented by this case and addressed them thoroughly in multiple opinions. Those opinions are almost entirely correct and should be affirmed, except in narrow circumstances that are set out in our brief. And I'll try to address one of them today. But I want to mainly focus on the attacks against those individuals. Those opinions leveled by the plaintiffs and the DOL today, although I guess the DOL is largely defending certain positions except the limitations argument. Let me begin, if I may, with the limitations argument. The district court correctly held that the six-year statute bars challenges to fund selection decisions made more than six years before the commencement of the lawsuit. It's very important to be clear about what the challenge is. As Judge O'Scanlan pointed out, the plaintiffs are challenging the discrete initial decision to select these mutual funds with retail share classes, not challenging particular events that occurred within the limitations period. What I just heard was that they were not challenging the initial decision. They were challenging the retention or the keeping of the funds over the time period. And I was just going to get to that point, your honor. They're only doing that in a very conclusive way. Thank you very much. They're doing it in a very conclusory way in the sense that what they say is that when they challenge that initial decision, they get to keep challenging it literally in perpetuity forever because it's a continuing violation. So it's true that they're challenging the failure to remove it, but only in the sense that there's a continuing duty to remove and change and revisit an earlier decision that is later said to be imprudent. It's very important to be clear they are not. Nowhere in their complaint will you find, nowhere in their papers will you find, any moment at which they say within the six years prior to the commencement of the suit, a certain event happened. There was a moment when the Edison producers were presented with new information about these retail share classes. They looked at it. They considered it. And they rejected it. And they instead said we'd rather have retail classes as opposed to institutional share classes. That's not the nature of the challenge. That would be a different case if it's not presented here. The case they have brought is one that says in the late 1990s, they selected certain mutual funds with retail share classes when, in the late 1990s, institutional share classes were available. And we, the plaintiffs, can challenge that literally forever. This court in the Phillips case, which Judge O'Scanlan was a member of the panel in, rejected the proposition that there's a continuing violations theory under ERISA like that. The case itself was about the three-year statute, but Judge O'Scanlan's concurrence correctly pointed out that the analysis applies equally to the six-year statute of repose. What we hear this morning is under the six-year statute of repose, the continuing violations theory is sort of baked into the statute because of the language of the provision that says the statute is triggered following the quote, last act which constitutes part of the breach. Well, that's clearly right, but that language supports our position because the last act which constitutes part of the breach was the act, the decision to include these funds. There are no subsequent acts. That's the caveat I was providing earlier. It would be a different case. So your success depends on there being no changed circumstances from the initial decision? No materially changed circumstances, exactly. No circumstances that are relevant to this particular decision. And that's what was actually tried below with respect to three of the funds. The plaintiffs had the opportunity to put on that case. They tried to demonstrate that there were materially changed circumstances, and as a matter of fact, the court found that there were none. And with respect to two of the funds, there was literally just a change in the name as a matter of substance, which didn't give the fiduciaries any occasion to revisit that earlier decision. And with respect to another one, there was a change in the investment strategy, and the fiduciaries did look at that, considered it, and decided not to change the fund. But it didn't give rise to any basis for reconsidering the share class. And so the point is there was no materially changed circumstance that caused the fiduciaries to revisit that decision. And under those circumstances, there's no basis for allowing plaintiffs and participants to sue. Again, literally forever. They're perfectly candid about that. It's a rolling statute, according to them, but that's not what the language says. After six years for an imprudent decision, absent changed circumstances, the fiduciaries are entitled to repose. This is part of the balance. Case after case in the U.S. Supreme Court has emphasized that a risk was not enacted merely to and only to protect the interests of beneficiaries. That was clearly an important part of it, but it was also enacted to balance competing interests and to encourage plan formation. And as part of encouraging plan formation, the Congress balanced various considerations, various interests, various rights, and gave employers, plan sponsors, and fiduciaries certain rights and interests as well. One of those is repose. After six years, you don't have to maintain all those records. You don't have to keep revisiting an earlier decision, applying the same standards you originally applied. To be clear, there is a continuing duty to monitor. We don't disagree with that. But it's to monitor and be sure that there are no changed circumstances that cause you, compel you to revisit that decision. So it's not, the concern is not that, it's not real, a legitimate concern that a decision like this will be, actually remain a part of a plan forever because, first of all, participants and the DOL have six years to challenge an imprudent decision. There's six years to do that. So it's not likely that these kinds of things are going to maintain forever. When there are changed circumstances, there obviously is a duty to revisit and change and reconsider the decision, and circumstances do change all the time. And third, to be clear, fiduciaries have an ongoing fiduciary duty, and they know that. There aren't fiduciaries out there who are just looking for excuses, looking for reasons to wait that six year and a day, and they say, Aha, thank God, our imprudent decision six years earlier is now secure. We have no concerns. That's not how fiduciaries behave. Congress didn't have evidence before that suggested they did behave that way. And so any responsible fiduciary, of course, when they become possessed of information that indicates there's, for example, an institutional share class that's available rather than a retail, and there's no reason not to take it, any responsible fiduciary will do that. The DOL raised the hypothetical of the person who enters the plan after the initial decision is made. How does the statute run vis-a-vis those people who enter after the decision? I think with respect to them, remember, fiduciary breach claims are asserted on behalf of the plan.  And so you've got six years for plan participants and the DOL to bring an action under these circumstances. And absent that, the statute of repose at that point allows fiduciaries to continue on with plan operations. Again, absent any reason to change. And when there's a reason to change, they will do so acting as responsible fiduciaries. And if they don't at that point, the new participants can sue. But I think at that point, the new participants come into the plan sort of as it stands, given the fact that fiduciary breach claims are asserted on behalf of the plan. I'll just make one other point on the limitations period, and that's with respect to an issue raised in the plaintiff's reply brief and mentioned briefly this morning, and that's with respect to the duty to cure an omission under 413B. This is not an omission case. They are not asserting that there was no omission here. What there is is an act and then a failure to cure that act, an asserted failure to cure that act. The theory that that's an omission, the failure to cure a prior affirmative act, would literally eliminate the statute, would eliminate the distinction between the last act language and the failure to cure an omission. So this is not an omission case, and they can't rely on it. And to the extent there's a difference there, it actually, again, supports our point that the last act is an affirmative act that closes, the act is complete, and then participants have six years in which to bring an action to challenge it, after which the fiduciaries are entitled to repose, again, absent any reason that they ought to be revisiting it. If I could turn to the second point raised by Mr. Wolf, and that is the challenge to the court summary judgment on the money market fund and unitized stock fund ruling. As I believe the panel pointed out in questioning, this analysis has to start from the fundamental premise that courts do and must give very wide latitude to fiduciary judgments about what investments to be included in a 401k plan lineup that makes sense at a given time, given different demographics, different socioeconomic factors. Subject to the prudence rule. Subject to the prudence rule. It exists, absolutely, but the prudence rule itself creates a wide scope of reasonableness for fiduciaries in acting, and it has to, because courts, with all respect, are not in a position, after the fact, to put themselves in the position of a plan fiduciary and say, well, I would have done it differently. I think it would have made more sense to have, you know, this Wellington fund over here rather than this Fidelity fund over there. That's not what courts are well equipped to do. That's what fiduciaries are supposed to be doing, and so, given a wide berth, they can and sometimes do reach their responsibilities, but that's within the scope of a broad range of reasonableness that courts have to defer to. Now, with respect to the money market fund, the district court correctly held that there was no legal requirement, it wasn't a breach of fiduciary duty and the duty of prudence, to use the money market fund rather than the stable value fund. The primary submission in the brief, and again this morning, is that the plan simply never considered a stable value fund, but that's not true. The court said, and Mr. Wolf acknowledged, that David Ertel testified to the fact that he did consider a stable value fund, and here's what he said in the deposition. When we got to this round, this is at SCR 767-68, when we got to this round of changes, you know, it was fast forward to 1999, I thought our conclusion was that that approach of having a short duration bond fund should provide good returns comparable to stable value type funds, and we continue to offer that, the bond fund, under the new lineup that we have. It is in the mutual fund menu, the PIMCO low duration fund, that's the bond fund, and so we would view that as being, you know, the alternative to, that could provide similar sorts of returns to the stable value fund. So what Ertel, what the Edison fiduciary, and Ertel was a staff member working essentially on behalf of the fiduciaries, determined was that they actually did consider adding a stable value fund, and decided they didn't need to, it didn't make a great deal of sense, they could have, but there was already a bond fund in the lineup that provided similar returns to what a stable value fund would provide. So the correct comparison really isn't between the money market fund and the stable value fund that was not added, it's between the stable value fund and the bond fund that was already in the lineup, and that's absolutely a reasonable decision. It could have been a different decision. Ertel and the fiduciaries could have decided that, sure, we'll add a stable value fund, even though it's somewhat redundant to the characteristics of a bond fund, but that's what fiduciaries do, and courts aren't in a position to second guess that. With respect to the stock fund, it is the industry standard for large 401ks to have unitization in a stock fund. It provides more liquidity, there's daily tracking. Plaintiffs in their brief complain that it dilutes the cash value, that the cash dilutes the value of the stock when its stock increases, but the whole point, of course, is that it's a hedge. It does minimize or reduce, not minimize, but reduce the upside benefit when the stock increases, the fact that there's cash in the fund, but it also reduces the downside risk, and again, that's a perfectly legitimate consideration for a fiduciary acting ex ante, before, of course, you know that the stock is going to increase. Here the stock did increase, so it looks like, in retrospect, that the plan would have benefited had they had only stock rather than the additional cash, but that's a decision that can't be determined ex ante. You don't know that the stock is only going, of course, to go up. The plaintiffs do point to the Seventh Circuit case in the George decision, which criticized the fiduciary for having failed to consider the consequences of having cash in the fund, but that's not what happened here. First of all, we think that Judge Cudahy's dissent makes more sense in George, but second of all, the facts here demonstrate, and they're not disputed, the facts here demonstrated that there were restrictions put on other options in the fund in a way, excuse me, in the lineup, restrictions that had the effect of reducing the liquidity target and thereby lowering the amount of dilution that came from the cash in the fund, so we dealt with, the fiduciary dealt with the very problem that was at issue in the George case. Counsel, are you going to speak to the revenue sharing issue? Yes, I'm happy to do that. Whatever the panel is interested in, to be sure. What Mr. Wolf argues with respect to revenue sharing was just that the plan prohibited, the plan language prohibited use of revenue sharing. There are other points. There's a general point that it's categorically imprudent to use funds with revenue sharing that's addressed in the brief. Let me address his argument that the plan prohibited. He's relying on Section 1902, which provides that the cost of administration of the plan will be paid by the company. The district court correctly held that that language does not preclude the use of revenue sharing to offset the fees paid by Hewitt because, as a very simple matter, Edison did bear the cost of administration. That's what happened. Revenue sharing just reduces the costs charged by Hewitt. But Hewitt's invoices, Hewitt's bills, are the cost of administration. And the revenue sharing that Hewitt received from the mutual funds allowed Hewitt to charge Edison less. So Edison bore the complete cost of plan administration. I should have asked Ms. Hoskins' question, but on this particular point, I gather the Department of Labor does not have a problem. Is that correct? They certainly don't assert in the brief, and in the brief in the Hecker case, they fully agreed and Hecker held that revenue sharing is not a plan asset. It doesn't belong to the participants, and that's the error that plaintiffs are making. Does the Patelco case have anything to do with this? We don't think so. Certainly not. Patelco doesn't address the plan administration point. Let me just finish off that point, if I may, because it's important to understand why the revenue sharing doesn't come. Their whole point, plaintiffs' whole point is that, well, with revenue sharing, the participants are paying the cost of plan administration, not Edison. But that's wrong because revenue sharing isn't paid by participants. The fund cost, the cost of a given fund to investors in the fund is reflected in the expense ratio. That's the only cost that they pay in any respect. And that expense ratio is the same for all investors in a given fund. There aren't funds that are just 401K, Edison 401K participants. These are particularly in the retail market. These are funds that are available to all investors. All investors pay the same expense ratio. It is fixed by the mutual fund advisor who is collecting various fees to administer the fund. The assets in the fund, and Arisa is explicit about this, the assets in the fund are not plan assets. Those belong to the mutual fund and the investment company and the mutual fund advisor. And the fees collected from those assets are the mutual fund advisor's fees. They don't belong to the plan participants. The mutual fund advisor can do anything the mutual fund advisor wants with those fees. So there is no financial consequence to the plan participants with respect to those funds, the revenue sharing part? None whatsoever. Zero. The revenue sharing doesn't increase the plan costs. What you have to look at are the expense ratios of a given fund compared to the expense ratios of another fund. The revenue sharing isn't part of that calculus. The expense ratio, and with respect to every fund in this case, and this isn't contested on appeal at all, with respect to every fund in this case, the expense ratios were comparable to other available alternatives. These were not unduly expensive funds. The claim that they are unduly expensive is based on the existence of revenue sharing. But if you took revenue sharing out of the equation with respect to a given fund, Hewitt just somehow said, we don't want your revenue sharing, mutual fund advisor. We're just not going to take it. That wouldn't change the expense ratio one cent with respect to any of the investors in the fund or with respect to any participants. Hewitt just simply wouldn't get the revenue sharing. It would stay in the pocket of the mutual fund advisor because it belongs to the mutual fund advisor. Assume this changes. Assume that the plan doesn't say that costs will be paid by the company, but it says costs will be paid by the plan participants. How does revenue sharing conflict, if at all? Well, I don't think there it would conflict. It would just be revenue sharing would go to Hewitt. Hewitt would do whatever it does with the revenue sharing. There would be negotiations. The plan sponsor would still have to negotiate to provide for services to be provided for the plan. Hewitt, in this circumstance, would presumably provide those services, and it might take revenue sharing from the funds that it works with. Ultimately, aren't the plan participants, when it's paid by the company, ultimately bearing the cost? With revenue sharing? Yes. No, they are not. They're not. They're not at all because the plan participant participates in a fund, becomes an investor through the 401K plan in the fund, and the cost of that fund are reflected in the expense ratio. The expense ratio is what it is. The mutual fund advisor takes the fees. The expense ratio is essentially the mutual fund advisor's fees. To the extent the fees are high or low, the plan participant is affected. That's true, but revenue sharing doesn't affect that because the mutual fund advisor can do whatever it wants with the fees. Sometimes they share costs with service providers who assist them in providing services, and sometimes they don't, but the expense ratio is the same for all investors. It has to be under SEC regulations. There isn't a difference. It's not like the participants are paying an extra amount because of revenue sharing. It doesn't change, and so they're not bearing the cost. The mutual fund advisor is providing revenue sharing. Hewitt is bearing a certain amount of cost, if you will, by providing the offsets, but the participants are not bearing any of the cost. Edison bears the entire cost because the only cost of plan administration is the cost that it pays, the price it pays Hewitt for its services. Hewitt's cost is reduced by the fact that it gets revenue sharing, but it's still a bill that it provides to Edison. Edison doesn't. The participants don't pay the cost at any point. This is spelled out very clearly in the Hecker case and followed up in Exelon by Judge Easterbrook. I'd like to address briefly the 404C argument. I would just urge the Court to look at the Langbecker case. We think that spells out very effectively why 404C applies to this circumstance. The participants have control over their investments, and under these circumstances, Edison is entitled to the benefit of the 404C safe harbor, which applies when the loss results from the beneficiary's exercise of control over the assets in his account. The one point I would make is this only secures against liability for a loss. It doesn't mean the fiduciaries forever get away with imposing imprudent choices on a plan because you can still bring an action to remove the imprudent choice. What this does, again, pursuant to the balancing that Congress provided, is gives fiduciaries security against loss that is occasioned by the fact that when there's a sufficiently diverse range of options, the participant chose to invest in one particular option rather than another one. Thank you. Thank you for your time. The case just argued will be submitted for decision.
judges: Zouhary, Goodwin, O'Scannlain